William **TEAGUE** et al., Appellants,

v.

Mary L. **REID** et al., Coexecutors Under the Will of Mary T. Wells, Appellees.

Court of Appeals of Kentucky.

Nov. 11, 1960.

James A. Hubbs, Nicholson & Hubbs, Louisville, for appellants.

Robert L. Ackerson, W. W. Evans, Louisville, for appellees.

PALMORE, Judge.

This matter comes before us on motions for appeal from judgments entered in two companion suits seeking the recovery of separate parcels of real estate theretofore conveyed by the plaintiffs' testatrix to the respective defendants. In each case a summary judgment was entered directing the reconveyance of the property on the ground of failure of consideration.

The appellants are William Teague and Agnes Henze, a son and daughter of Mary T. Wells, the original plaintiff (who died during the pendency of the litigation), and their respective spouses. The appellees, Mary L. Reid and her husband, Mark A. Reid, are coexecutors of the will of Mrs. Wells. Mr. and Mrs. Reid are also the sole beneficiaries under the will, Mrs. Reid being another daughter of the testatrix.

In January of 1957 Mary T. Wells, then approximately 64 years of age, conveyed her home at 3232 Taylor Boulevard in Louisville to her son, William Teague. At or about the same time a written agreement was executed between them reciting that the conveyance was made without monetary consideration and providing as follows:

"It is hereby agreed by and between the parties as follows: The party of the first part is to be permitted to remain in this property as her own home without the payment of any rent for so long as she lives. In the event the party of the first part decides to move from this property and the property is rented, then all rents from this property is to go to the party of the first part.

"The party of the second part further agrees to pay all taxes and all insurance and to make and pay for all necessary repairs on said property, also the party of the second part further agrees not to encumber, sell, dispose or put any other liens of any kind or description upon the property being conveyed without the written consent of the party of the first part; the party of the second part also agrees to support and maintain the party of the first part and to furnish her with all necessary medical supplies and physicians that she may need. It is further agreed and understood that should the party of the first part not receive any of these benefits and not be satisfied with the arrangements, then the party of the second part agrees to reconvey the property at 3232 Taylor Blvd., to the party of the first part."

Mrs. Wells continued to reside in this property until her death in January of 1959, and it appears from discovery depositions that she rented out rooms in her home, receiving the proceeds for her own use and benefit.

In addition to the property conveyed to William Teague, Mrs. Wells owned two other residential properties located at 1144 South 28th Street and 1405 Rufer Avenue in Louisville. A few days following the Teague transaction she conveyed the 28th Street property to her daughter, Agnes Henze, and at or about the same time an agreement was executed between them in exactly the same terminology as the aforementioned agreement between Mrs. Wells and Teague, except for the address of the property. Since Mrs. Wells did not reside at this place, that portion of the contract relating to rentals was even more ambiguous than the similar clause in the Teague agreement.

In March of 1958 Mrs. Wells conveyed the Rufer Avenue property to Agnes Henze, but without the knowledge of Mrs. Henze, so that there was no written agreement as in the cases of the other real estate. When Mrs. Henze became aware of this

deed she apparently assumed, however, that the same contractual arrangement would apply to it as applied to the 28th Street property theretofore conveyed to her.

Each of the conveyances herein mentioned was made at the volition of the grantor, without solicitation or suggestion from the grantees. In a deposition taken in October of 1958 just after these actions were filed, Mrs. Wells gave as her motive in making the conveyances that she had been in declining health for some ten years, had suffered several heart attacks, and wished to settle her affairs. Of all her several children William Teague and Agnes Henze had been and were the closest to her and were "the ones that will look after me and the ones I can trust." The other children, she said, had their own business affairs, and she felt that William and Agnes "would be squarer with me."

It seems that the Teagues operated a restaurant and Mrs. Wells worked there until she became "bad sick" in June or July of 1958. She worked there not of necessity but because she wanted to and because thereby she could help take care of the Teagues' baby. It is utterly clear from her own testimony that up until this time there was no rift between Mrs. Wells and William and Agnes. She evidently had the income from her roomers and from the 28th Street and Rufer Avenue properties, and it was the understanding of William and Agnes that this revenue was intended to satisfy their obligations under the contracts. In fact, William testified that Mrs. Wells specifically "told us that we didn't have to pay that as long as she was getting that money off the houses." It is apparent that Mrs. Wells must have had a similar conception of the situation, because she said repeatedly in her testimony that she had never asked them for anything, had never told them she had any bills (except for a $5 drug bill William paid for her one day when she did not have enough cash with her to pay it herself), and wouldn't ask for anything anyway. For example, when questioned as to whether she had discussed her hospital bills with them she replied, "No sir. I am independent as a hog on ice, man." She admitted, however, that she thought they would have given her anything she asked for, and the only conclusion fairly deducible from the whole of her testimony is that she was at no time in any financial straits and did not actually look to William and Agnes for any support or for the payment of any taxes, insurance, repair bills, or medical expenses. The mere actions of the parties were mute evidence of a contemporaneous construction of the contracts which in this respect tends to resolve the hereinafter discussed ambiguity of the provisions relating to the rental income of the properties involved.

There was a short interval in July or August of 1958 after Mrs. Wells ceased working at the restaurant and before she entered the hospital for an operation. She was by then (or thought she was) a diabetic and was suffering an intestinal obstruction (it developed that she was a victim of cancer). William and Agnes continued to visit her at home during this interim. One night she telephoned William and told him that the doctor had taken her off insulin and that she was fearful of a coma and thought someone ought to be with her. When the conversation ended she was of the impression he was coming. He, on the other hand, apparently underestimated her state of mind and did not realize she expected him to come. It was a fatal error. As Mrs. Wells "waited and waited" and the night wore on she became distraught and at last telephoned the appellee Mary Loretta Reid, from whom she had been estranged for some time. Loretta came immediately and brought Mrs. Wells home with her. Soon thereafter Mrs. Wells began spending every night with the Reids, and this continued until she went to the hospital. When Mrs. Wells came home from the hospital the Reids went to live with her at 3232 Taylor Boulevard, and were living there at the time Mrs. Wells' deposition was taken in October. Meanwhile, in September, Mrs. Wells made a will leaving

her entire estate to Mr. and Mrs. Reid, and on October 3 she commenced these actions to recover the real estate she had theretofore conveyed to William Teague and Agnes Henze.

In her deposition Mrs. Wells frankly conceded that the only reason she wanted the property back was that she had changed her mind about what she wanted to do with it, and that the cause of her change of mind was that "I got very vexed and everything when I was so bad sick." She said she couldn't get William and Agnes when she needed them before she went to the hospital, but in so saying she recognized that they may not have been entirely at fault in this respect by adding: "Of course, I guess I was over at Loretta's house, but I couldn't help that."

The summary judgments were entered on the basis of the pleadings, the two contracts, and the depositions of Mrs. Wells, William Teague, and Agnes Henze. As we have said, the suits were filed October 3, 1958. Answers were duly asserted on October 28, 1958. The deposition of Mrs. Wells was taken October 21, 1958, and those of William Teague and Agnes Henze on November 18, 1958.

Each complaint alleges the conveyance, the consideration (as stated in the separate agreements), plaintiff's demand for a reconveyance and defendant's refusal, and defendant's failure to pay plaintiff's current medical expenses. The Teague answer says the complaint fails to state a cause of action, admits the conveyance, disclaims information sufficient to admit or deny with respect to the terms of the separate contract (which was not filed with the complaint), admits that plaintiff has incurred medical bills but denies any knowledge as to what they are and states a willingness to pay them. The Henze answer is identical and is obviously intended to form the same issues, though apparently through inadvertence counsel failed to note that the two conveyances alleged in this complaint resulted in an additional paragraph and,

therefore, a different relationship between the paragraph numbers and the contents of the complaint.

Following the taking of the depositions plaintiff moved for summary judgment, tendering the two contracts with the motions. On the strength of admissions by William Teague and Agnes Henze in their depositions that they had not paid for any medical bills, insurance, repairs, or taxes (except for the aforementioned $5 and one tax bill paid by Teague after Mrs. Wells had demanded reconveyance), the chancellor wrote counsel for the respective parties a letter indicating his intention to sustain the motions. Counsel for defendants then made a "motion to set aside summary judgment" in the Teague case on the ground of newly discovered evidence, supported by his statement to the effect that Mrs. Teague, who had not been present at the taking of the depositions, had brought him cancelled checks in the amount of some $870 that she claimed to have spent for the benefit of Mrs. Wells and had in her possession other checks evincing similar expenditures. It was explained that Mrs. Teague was the "banker" of the Teague family and that William Teague was not informed and did not know of these matters when he gave his deposition.

While the foregoing motion was under consideration, and before the summary judgments were entered, both the Teagues and the Henzes tendered and moved for leave to file amended answers. The Teague amendment, supported by affidavit of Deloris Teague, alleged affirmatively that they had complied with the contract, citing, inter alia, cancelled checks totalling $1,139.52. It was further alleged that there had been an agreement with Mrs. Wells that she was to keep the income from the property and defendants would "take care of any unpaid bills and monetary requests of the plaintiff"; that there were in fact instances in which they paid bills for Mrs. Wells; and that between the Teagues and the Henzes (who were in financial straits, Mr. Henze being a patient at Waverly

Hills Sanitorium) there was an agreement under which the Teagues were to take care of any financial obligations with respect to Mrs. Wells. The amendment tendered by the Henzes was along the same lines. Also filed were other affidavits and counter-affidavits, but it is unnecessary to summarize them here.

Mrs. Wells died on January 25, 1959, while the matter of the summary judgments was under advisement. Upon revival of the actions the chancellor determined against permitting the amended answers and thereupon entered summary judgments granting the relief demanded by the complaints. A memorandum opinion made a part of the record indicates that he did not consider the appellants diligent in coming forth with the information that was made the basis of their proposed amended answers, and, further, that the death of Mrs. Wells would make it virtually impossible (under KRS 421.210, the "dead man's statute") to prove the defensive matters set forth in the tendered amendments.

■ As we consider the record sufficient (though barely so) to show that the matter in controversy in each case is $200 or more, we have jurisdiction to entertain the motions for appeal. KRS 21.080.

The developments of this litigation have been here recited at length because the disposition of the issues presented by the appeals requires a detailed understanding of the facts and circumstances of the case.

It is our judgment (1) that the trial court erred in declining to allow the amended answers and (2) that even in the absence of the information tendered after the motions for summary judgment had been submitted and tentatively decided, plaintiffs were not entitled to summary judgment.

■ A summary judgment is appropriate only where there is no genuine issue on the controlling facts of the case and a checkmate is certain. Accepting at face value the authorities cited by appellees to the effect that the reception and considera-

tion of further affidavits or pleadings after hearing a motion for summary judgment is a matter within the sound judgment of the court, still it is always desirable that a lawsuit be decided on its merits. The information appellants sought to plead was of real substance and created a genuine issue. Had it entered the case in the form of evidence at a trial it would have been incumbent on the court to permit an amendment under CR 15.02 to conform to it. It is true, of course, that appellants did not seem to react fully to the gravity of their situation until they were almost out of the courthouse and in the street, but it must be remembered that Deloris Teague was not present when the depositions were taken. She had an interest in the property and was a party defendant. She was not necessarily bound by her husband's testimony. Moreover, the complaints *did not allege any failure of consideration except as to the current medical expenses,* and there was no issue as to the other matters except to the extent that such an issue was suggested by the depositions and perhaps argued at the hearing on the motions for summary judgment. And as to the medical expenses, which were in issue, the evidence was rather conclusive to the effect that appellants had not been given a fair opportunity to pay them. If anyone was entitled to a summary judgment at this stage of the proceedings it was the defendants rather than the plaintiffs. So, quite aside from the lack of diligence on the part of Mr. and Mrs. Teague in comparing notes, there was actual confusion as to what the issues of fact really were, and this alone was enough to justify amendments designed to present the appellants' defenses in full. Under the circumstances we conclude that the disallowance of the amendments was a clear abuse of discretion.

■ Whether KRS 421.210(2) will effectively prevent proof of the matters pleaded in the amended answers cannot be predicted. Certainly they might be proved by disinterested witnesses. As to the defense that the parties had agreed that the income

from the properties would be received by Mrs. Wells and applied to the satisfaction of the contract obligations of William Teague and Agnes Henze, the depositions taken prior to the death of Mrs. Wells provide amply supporting evidence and, in view of the testimony of Mrs. Wells herself, seem all but conclusive of the point. In this connection, since Mrs. Wells had testified in her own behalf, testimony by William and Agnes otherwise barred by KRS 421.210(2) may well be subject to the saving provision of subsection (c) of the statute section, which creates an exception where "The decedent, or a representative of, or someone interested in, his estate, shall have testified against such person, with reference thereto." This aspect of the matter is not discussed in the briefs. Be that as it may, it is readily apparent that the application of the dead man's statute in this case is not a cut and dried matter and surely not a valid basis for rejection of the tendered amendments.

Assuming, however, that the court had properly excluded the matters suggested by appellants after the hearing, let us examine the question of whether there were undisputed facts sufficient to force a judgment for plaintiffs.

■ As to the Rufer Avenue property conveyed to Agnes Henze, the answer placed in issue the terms under which the conveyance was made. In her deposition Agnes testified that she had not known that her mother conveyed both the 28th Street and the Rufer Avenue properties to her. The only agreement produced in support of the summary judgment against her related to the 28th Street parcel. The Rufer Avenue deed was made over a year later. She may have assumed, on discovery of the conveyance of the Rufer Avenue property, that the same agreement applied, but an assumption is not a contract. So far as the record shows, the fact is that there was no such contract. Therefore, we cannot find any valid basis for a summary judgment against Mrs. Henze as to the Rufer Avenue parcel.

■ With regard to the other two houses a proper identification of the issues requires a construction of the written agreements. They obligate the grantees to pay for all taxes, insurance and repairs on the property, to support the grantor, and "to furnish her with all necessary medical supplies and physicians." They call for a reconveyance if the grantor should "not receive any of the benefits *and* not be satisfied with the arrangements" (emphasis added). We do not construe the latter provision as requiring a reconveyance on the sole ground of dissatisfaction, and appellees do not so contend. In that respect the case falls within the rule stated in Elswick v. Elswick, 1927, 220 Ky. 723, 295 S.W. 1070, and Moore v. Bugg's Ex'r, 1958, 274 Ky. 135, 118 S.W.2d 185, 189, which decisions, though involving rescission rather than specific performance, rest upon the same principle, to wit, that the recovery of property conveyed in consideration of future support must depend on a breach that is real and substantial.

■ "It is the rule that the power reposed in courts of equity to set aside deeds solemnly entered into between the parties is an extraordinary one and will not be lightly exercised. * * * Nor will rescission be allowed for a mere slight or casual breach with no damage to plaintiff." Moore v. Bugg's Ex'r, Id.

As we have indicated, the only failure of consideration alleged in the complaints was as follows:

"That Plaintiff since the conveyance of the above described property has incurred medical expenses which said Defendant has not paid, and that Plaintiff is at present seriously ill, and has incurred numerous medical expenses to date and will incur further medical expenses as a result of this present illness, and that said Defendant has not as yet paid any of the expenses and shown no willingness to pay any fur-

ther medical expenses incurred by the Plaintiff."

■ The appellants answered to the effect that they did not know what the medical expenses were but would pay them. There was nothing in the depositions to show that Mrs. Wells either expected or gave them any opportunity to pay these bills. They could not have paid them without knowing what they were. It is true, as held in Bogie v. Bogie, 1876, 41 Wis. 209, and Barnes v. Barnes, 1892, 9 Mackey (D. C.) 479 (both cases cited at 112 A.L.R. 710), that one who has conveyed his property away in consideration of a promise of support must not be expected to supplicate. He does not have to come begging at the door with a tin cup. But all of this is subject to the rule of reason. See, for example, Carpenter v. Carpenter, 1943, 293 Ky. 317, 168 S.W.2d 1014. Under some circumstances the obligor might not reasonably be heard to say that he did not know of the need, but in the particular circumstances of this case we think it was incumbent on Mrs. Wells or her successors to make a clear showing that appellants had been notified of what they were expected to pay. Indeed, if there was no genuine issue of fact on this point it was only because of a flat failure of proof by the plaintiff, and in that state of affairs the only parties possibly in a position to move for summary judgment were the defendants.

■ In the taking of the depositions counsel for Mrs. Wells went beyond the issues technically joined by the pleadings and developed the broader question of whether defendants had performed all their various obligations under the agreements. Mrs. Wells testified that she had asked nothing and they had paid her nothing (except for the $5 drug bill heretofore mentioned). In response defendants testified that they had paid her, but in the form of the property rentals, as orally agreed. Unfortunately Mrs. Wells did not live to give further and more satisfactory evidence

in this respect, but in any event it cannot be gainsaid that here was presented a genuine issue of fact, subject to legitimation under the curative provisions of CR 15.02.

■ Appellees cite the parol evidence rule and contend appellants may not vary or contradict the terms of their contracts with Mrs. Wells by explaining the arrangement as to the rental income. Hence it is argued that no genuine issue of fact can be formed by such a response. However, as correctly pointed out by appellants, where the terms of a written contract are ambiguous extrinsic evidence is admissible to explain it. Blevins v. Riedling, 1942, 289 Ky. 335, 158 S.W.2d 646; Hammon v. Kentucky Central Life & Accident Ins. Co., Ky.1956, 289 S.W.2d 726. Both of the contracts in this case are ambiguous with respect to the rental income. The Teague contract provided that if Mrs. Wells should move out she would be entitled to the rents. She did not move out. It develops that she had roomers who paid rent. What was the intendment of the contract as to those rents? Surely this question, this ambiguity, requires explanation. The Henze contract, covering the property at 1144 South 28th Street, contained exactly the same provision. Yet Mrs. Wells did not live there at all. It was rental property in the first place. Therefore, what did that contract mean with regard to the rental income? This ambiguity calls for an explanation also.

■ From what has been said it follows that there was a genuine issue or issues of fact requiring determination before the rights of the parties could be properly adjudicated. This was true at the time the motions for summary judgment were made. Therefore, the summary judgments would have been erroneous even in the absence of the new matters tendered by appellants.

The motions for appeal are sustained, judgments reversed, and the causes remanded for further proceedings consistent with this opinion.